Thank you, Your Honor. Jason A. Archinoco on behalf of Appellants and Cross Appellees, Thomas Atencio, and John Caterin. I would like to reserve ten minutes for rebuttal given the fact that we have arguments here. I'll divide my argument here. Thank you for having oral argument. Thank you, Your Honor. Thank you for oral argument. To begin with, I just wanted to start with the fact that my clients remain very proud of the fact that they created Tunecore. They were two of the founders. Tunecore started off as a very nation idea. The idea was that you could piggyback basically a license into the iTunes store. Independent artists had been held out of the record stores, and they were strangled by the middlemen, the big record companies that would extract deals from them. Mr. Atencio, who was basically an artist rights person throughout his career, involved with Tom Petty, No Doubt, New Order. He also was a founder of Lollapalooza and Rock the Vote. He was attracted to the project, as was Mr. Caterin, who was a person who was involved with eMusic and the 99-Cent Download. They had sort of quasi-fame in the music industry in the sense that these were the type of people that would be needed to form a company that could break through this huge barrier. And they succeeded. They succeeded at doing this. The company exists today and still in dispute as to how much the companies were. But as of April of 2015, the company was sold, at least according to Tunecore, in a cash deal worth approximately $35 million. So my client's activities here were successful. And although the amounts in controversy before this court are relatively small in the big picture, the options being about $250,000 and $1.27 per share, or about $1.7 million or so if they were $7.23 a share, as the arbitrators found and Tunecore never appealed. In the big picture of things, for what these gentlemen did, the amount in controversy is not large. But the issue here before the court is large, particularly the first issue about whether or not options are wages under either California or Massachusetts law. First, I'd like to say that with regard to both of these gentlemen's options, the story that Tunecore has told you all about the opportunity to invest is a fantasy. You can confirm that by simply looking at the original option agreements themselves, where in paragraph 10, an example of which is at ER-406, the option states that these are being provided in exchange for services. The reason that they did that is because the company did not have cash. So they used options at the outset as a cash substitute. Mr. Atencio was only paid options for his consulting work. Mr. Caterin was originally only paid options, but later in time was paid half pay. So instead of being paid at his normal rate of $180 an hour, he was paid $90 an hour, and then he received options in exchange for that other $90 reduction. Before you go too much further, and this is very basic, but my question is, a moment ago you said that whether the stock options would be wages under California or Massachusetts law. And you seem to have just jumped over the issue of whether the stock option agreement contained a choice of law provision that stated that it would be guided by New York, not California or Massachusetts. What is the jump that you're making to say that it's automatically California or Massachusetts? Since this says, the choice of law provision says it will be New York, Toon Corp is headquartered in New York. I just want to make sure I'm clear as to how you get to that point. Understood, Judge. Your Honor, I apologize because I am fully aware that you've read the briefs. Let me go back a second. Yes, you are correct. The contracts say New York law. So in order for me to get to California and Massachusetts law, I have to go through the steps that I put forward in the brief. And I have to convince you all that first, there's a conflict in these laws and that we should apply the laws of a different state, that there is a reason to do that. You're saying that California and Massachusetts have a material interest in what occurs in these contracts. Yes, Your Honor. Yes. And in fact, Your Honor, one of the reasons I state that is because Judge G herself pointed out in her opinion correctly that New York law does not apply to wages or states. So the reason why these gentlemen, why these other states have a material interest in a potential conflict between the law with New York. Mr. Cameron is working for Massachusetts. He did travel to New York, but primarily he's located in Massachusetts. And Mr. Atencio is located in California. So you are correct, Your Honor. I have to get over that first step. If the court first decides that there's no material conflict in the law, then we get no further. If the court decides that New York has a much greater interest and we should not apply these other laws, then I would lose also because you wouldn't get to the next step. So I do have to get past that. And I believe that I've shown to the court why we should get past that. I'm also citing to the court the recent pronouncement by the California legislature, which obviously is not binding, but shows that the California legislature just closed the loophole just like this to avoid this situation where another state's laws are applied to a California citizen, essentially depriving them of the protection of his state's laws. So, and Mr. Cameron also falls into that category. So at the outset, I have to first prove to you as clear, number one, that there's a difference. Then if we get to the difference, then I come to two things, which is first, on options, we have two issues here, which is California law and then Massachusetts. I want to address Massachusetts first, because there's a case I have to cite to you that came down in February of 2020 from the Massachusetts lead court. And I apologize that this has not been cited. I did file a rat on you with citation corrections. This case is Parker versus Inornock, E-N-E-R-N-O-C, Inc. The citation and the specific citation I'll provide to the court is 484 Mass, 128 comma 134, notes 10 and 11. And then the other citation is 139 N-E-3-D, 328. This case that came down in February, Parker addresses the issue of commissions that get paid off into the future. Now, we don't have a commission case here. We have options, but the analysis in Parker of the Weems case is consistent with what I have briefed to this court and is inconsistent with the analysis that the district court provided in Weems. Which is that once a person, and this is one of the definitions that the court gave for a wage or adopted in a footnote, they showed different. The reason this case is important, it cites two definitions of the word wage in Massachusetts. In the footnote, one of the definitions that they've adopted from another case is where an employee has completed the labor, service, or performance required of him, he or she has earned his or her wage. And what I think the way Massachusetts law falls down appears to be consistent with California and Schachter and also Bajoran. Which is that once you have proven that you have met all the conditions required of you to have earned your wage, you've then earned it. It's then yours. It can't be taken. Options obviously are very important in business that they be allowed to exist. This has been the backbone of Silicon Valley when companies don't have cash. That's what they did here. It is a cash substitute. So what you see is that with Massachusetts law for Mr. Caterin, the Weems case, if you get into analysis there, it's recently been interpreted consistent with my analysis about vesting. Schachter and IBM versus Bajoran are the California cases, and I don't believe that those are inconsistent despite the fact that people have tried to say they are. Why? Because although the rationales were used different in reaching the result, both Mr. Schachter and Mr. Bajoran tried to game the system. And they lost and they didn't prove that they had met all the conditions in their contract such that they were fully vested and would then become an earned wage. They fell short of that. I want to go back a couple of steps. You agree. It seems from your briefing that you agree if New York law applies, your argument fails on the wage claims, correct? Yes. All right. So the step that I'm not getting, and I think this follows up with Judge Morrison's question, sorry, Judge England's question, is the test we have to apply is whether California and Massachusetts have a materially greater interest. My review of the record indicates that the facts presented that relate to the factors we consider under that test, the location of contracting and negotiations and performance and all those things, the record is pretty lean in terms of the facts that support how we weigh those factors. And it's your burden. So tell me how it is that you have satisfied the materially greater interest standard. Well, Your Honor, I believe first and foremost, Your Honor, if we look at Judge Gee's citation in New York, wage law does not apply to work performed outside the state. And I believe the record is very, I think the record is clear, especially as to Mr. Tensio, all his work was performed from California. And as to Mr. Katerine, he traveled to New York from his residency in Mississippi. So first and foremost, I think in terms of the factor, I think the biggest factor that has to be looked at is where, from my viewpoint, where is the residence of the person and where did they perform the work from? And that's what I think the record is clear on. But I don't think Toon Corps has really contested any of that, Your Honor. So on that factor, I think that I think that is the most significant factor, especially when you look at Mr. Tensio, because Mr. Tensio performs all work from California. If California says this is a wage and New York says it is not, there's definitely a material conflict. And then you get to the issue of, OK, well, what factors predominate here? Well, the factor that predominates appears to be his residency and that he's a resident of California. It is true that there is an agreement entered into applying New York law. But at the outset of these agreements, these gentlemen were all known to have been working from different locations, at least for these two gentlemen. These two gentlemen were not going to be definitely Mr. Tensio, not stationed day to day in the headquarters. So I do think that I presented to you enough factors to get over this in terms of the test. I think I haven't. Toon Corps really has not spent any time on that. They just spent the time. They haven't really even contested that. They just said, well, let's get to the issue. And there's not an inconsistency here. I see I have seven minutes remaining. I'd like to reserve. But I didn't want to say something. Mission for a second. So all we have a certain amount of time remaining. Hopefully I answered your question. The judicial admission issue is just fairly unbelievable to me. I mean, the complaint unequivocally said, first of all, I show up in court. It's clear in the record. There's citations here that unequivocally I was contesting the value of the shares and the value of the option. And then at summary judgment, they didn't file on that. They didn't claim I made a judicial admission. All of a sudden we get a motion in limine saying, oh, this one paragraph in your complaint that computed the minimum value of the options became a judicial admission somehow. When I pointed to all the other, this is a minimum amount. They weren't paying for their securities. And I was fighting about the value of their securities the entire case. The judge then says, well, you couldn't pop quiz. You can't point us to evidence right now. As you sit here and discovery where you're contesting this. The bottom line is why they filed a motion to eliminate. They filed a motion to eliminate because they knew that we were coming in to say the shares were worth more money. Now, what's the good faith? Well, they denied the allegation the entire case. They didn't file a summary judgment. They spring this motion in limine on me, claiming I made a judicial admission, saying that it should be my insurance carrier basically paying my clients, not them, which share price when I'm fighting this the whole case. And so I get a judicial admission capping damages in the case. Now, what happened since is we had an arbitration with Mr. Cameron. The two court knowledges in filings with the court is binding on two in court and his judicial is judicially stops them in the arbitration. When I was able to present the evidence, the judge didn't allow me to present. I failed at proving that the shares were worth 725 a share like I intended. Instead, I proved that the shares were worth $7.23 a share. And two court didn't appeal that by. So if you remanded on that second issue with regard to the judicial admission, which I think I showed good cause to amend my complaint if there was any ambiguity. But clearly there was allegations in the complaint that alleged larger damages that essentially, if you remanded on that issue, either would be summary judgment or there wouldn't even be there might just be a clerk entering judgment because we now know the price wasn't $1.27 per share. It was 723 per share. And that is a big, that's a difference of 250,000 versus the 1.7 million. And that's basically what we were able to ultimately prove when I was given the opportunity. I have four minutes remaining. I'd like to reserve those for rebuttal if appropriate. Dr. Ellison, I think you're on mute. Oh, I'm sorry. Counsel for TuneCorp. Good morning, Your Honors. May it please the court. I'm Christian Nagy on behalf of TuneCorp. So the appellants are in their choice of law analysis sort of skipping ahead to element number three, alleging that either California or Massachusetts have a materially greater interest than New York in the execution of these option agreements. But they skip over the second application of restatement section 187, which is that the application of New York law would have to be greater, would have to be contrary to a fundamental policy of California or Massachusetts. And essentially that they're arguing that these option agreements were sort of forfeiture provisions of some sort under their respective state labor laws. And for that reason, the state labor laws should be applied and we should ignore the New York choice of law provision. But we don't even need to get into a choice of law analysis if the state laws are in accord that stock options are not wages. New York holds that. California holds that. And Massachusetts holds that. We've cited those cases. So why are we talking about wages as a forfeiture provision? It's clear to me, at least, that neither of the appellants were W-2 employees. Neither of them have alleged that they were performing work at the direction and control of TuneCorp. Mr. Atencio was in California. He had a rather amorphous relationship with the company that was something of, as an advisor of some sort. He did not receive wages, admittedly. Mr. Caterine was living in Massachusetts for all of the relevant time frames. And he commuted into New York, where at the time TuneCorp had its headquarters. He was invoicing them as a CFO until 2011, when he stepped down. So there was, at some point, oral contract causes of action. And Judge G decided that these, or correctly ruled that these were barred by the statute of frauds and barred by the statute of limitations. So these extra contractual claims, right, that this is somehow all indicative of an employment relationship, and that spills out over the edges of the option agreements and runs afoul of labor law, is really not supported by anything in the record. We have six option agreements. Each of these option agreements contain New York choice of law provisions. And New York, and Massachusetts for that matter, and California didn't dream up these termination clauses. These are a function of federal law. This is in Title 26, Section 422 of the United States Code, which governs incentive stock options and provides for a maximum exercise period of 10 years. So this is a difference in how options are treated. They're not treated as wages, because they cannot be quantified at the time they're given. They're only quantified as values at the time they are realized, meaning at the time they are tendered or exercised. There are too many contingencies. So all of Appellant's arguments here turn on whether these contingencies have been removed. And it's clear that they haven't been, right? You have to actually do something. There is no way of knowing when these options are awarded, right, whether the optionee is going to realize a gain or a loss. And if it's a loss, it gets passed due on their income, right? It's taxed differently. So let's just talk about California law for a minute. Is your argument that for something to be a wage, it has to qualify as a wage at the time it's issued? I guess what I'm getting at is I'm trying to understand what you're saying. So if the stock options at the time that they're initially issued wouldn't qualify as wages, but things happen along the line, the contingencies get resolved, and then maybe they do meet the definition because California has a fairly broad definition later after they've been issued, is your argument that they're either wages or not at the moment they're issued and no need to see what happens after that? Or is your argument something else? Well, they're never realized as amounts. If they were to exercise them, yes, then they would be entitlements, right? They would be transferred into entitlement. And the Supreme Court of California has said in chapter that the public policy in favor of full and prompt payment of an employee's earned wage is fundamental. However, nothing in the public policy of the state concerning wages transforms a contingent expectation of receiving bonuses into an entitlement. So as long as these options are unrealized, meaning they remain options, until you actually put in money and they become ownership interests, they're not entitlements. And how they're realized as gain or loss is an inchoate contract right. This court said that in the Pejori case, that options are merely contract rights, and they are unrealized until exercised. Did I answer your question, Your Honor? I think so. To follow up on what you just said, I mean, I don't know how to say the name Schachter. It does something to Pejoric, right? I mean, it changes. I know opposing counsel suggested that maybe they can be read consistent. I'm not sure that's true. Schachter did not address Pejoric's ultimate holding that stock options may be awarded pursuant to plans giving rise to expectations of stock awards, and are not awarded according to such plans, and ordinarily do not give rise to the expectation of a calculable sum of money. Schachter really only grappled with the second aspect of the Pejoric case, which was whether this narrow restraint aspect of whether you can restrain someone's exercise of their practice under the business and professions code. So this aspect of Pejoric is still preserved, and the California Supreme Court has never stepped back from that. I maintain that's still good law. And it's the same in Massachusetts and in New York. New York has held that deferred equity-based compensation of this kind constitutes, as a matter of law, incentive compensation, not included in the definition of wages under labor law section 190.1. So there is no reasonable basis. There's no fundamental policy that's been violated by the district court's treatment of this action as a contract action, as a written contract action. These appellants had contract rights, which they failed to formalize through the exercise and the tender of money within the timeframe contemplated by those option agreements. Each of them were slightly different, but consistent with federal law, the maximum amount of time in which to exercise was 10 years. The minimum amount was specified by contract, and those minimum amounts of times were variously 30 days or 90 days. They were providing some form of services, they allege, at all relevant times. However, we filed a motion for summary judgment, and in our motion for summary judgment, we argued that they were not continuously associated without interruption, which is a requirement, a precondition, a contingency, if you will, of these stock option agreements. They weren't doing any kind of recognizable service for the company. We don't know exactly when they stopped providing a cognizable service, but we do know that when the original CEO, Jeff Price, stepped down in 2012, none of the remaining TUNCOR board members or executives had any communication with either of these appellants about the work they were performing. They weren't doing work at the direction or request of any TUNCOR employee. They were, in effect, operating as these outside freelancers attempting to find an investor that would convert their options into cash by purchasing the company or by otherwise purchasing stock. They waited. They waited too long. Their options expired because they were no longer rendering services on behalf of the company. As of Jeff Price's departure in 2012, each of those options expired on their terms under contract rights, and that was unambiguous. Judge Gee said that there were some ambiguities there, but she failed to give full force and effect to every aspect of the contract. She looked at the word association in a narrow context but didn't consider that every incentive agreement is, in a sense, an encouragement incentivizing longevity with the company. That is a common theme throughout all of these stock option agreements. The point is to incentivize work that hasn't been done yet, work that is for the benefit of the company. In New York law, a case cited by the plaintiff, the Geary case, the court held that incentive agreements, incentive compensation agreements, are intended to benefit the company. It isn't dependent upon the work that the individual performs, but how the company ultimately performs that determines its fair market value. I'm getting a bit away from my point, but we felt that Judge Gee should have granted a summary judgment in our favor so that this dispute didn't reach the jury. In any event, it did reach the jury, and the jury ruled for the appellant. The jury awarded exactly what they had asked for. They sought a sum of money in their second amended complaint at paragraph 149, and they doubled down on that amount in their rule 26 disclosures. They never sought to amend that. They did not designate an expert for purposes of evaluation of the company. They themselves are not qualified to act as experts under federal rules of evidence section 701. They got what they asked for, and they haven't shown any error in that. We then moved for judgment as a matter of law post-trial on the grounds that Mr. Katerine had, in 2012, received a second opportunity to invest in the company. Having acknowledged that his shares, his option agreements had all expired around the time that Jeff Price stepped down, Mr. Price arranged for him to receive a second opportunity to invest in the company. Those shares were roughly equivalent to all of the shares he had vested at the time that he stepped down as CFO in 2011. He made several affirmative representations to board members and the attorney for CUNY Corp, suggesting that he understood that the company's understanding was that he knew that all of his other options had expired. That they had all expired on their terms, and that he was accepting this second grant of options as a means to acknowledge that he had these rights that were no longer extant. He loathed the principles into believing that he understood what the terms of that agreement were. We asked the court to find that he had waived performance for that reason, and the district court declined to enter judgment in our favor as to Mr. Katerine's claims. We maintain that that was an error. I'd like to address Mr. Archinoco's comments on the arbitration clauses or the arbitration materials that he submitted as a further excerpt of record. This is improper for this court's record. All of these arbitration issues happened after the trial, after the post-trial motions were heard, and after the appeal had been filed. So this court really cannot consider a record which was not perfected at the court below, that the district court has never seen, and really has nothing to do with this matter. Arbitrations are forms that adhere in equity and fairness, and don't adhere to rules of evidence, and it really has no business being in front of this court. I think I've addressed all of my major points. Does the court have any questions for me? I had a question about your argument regarding the jury instructions and the district court's failure to define performance. Mm-hmm. Was there an objection raised on that basis at the time the instructions were given? Yes. Yes, there was. Where is that in the record? I'm sorry, Your Honor, I don't have the site for that. We had in our, I think it's our volume one or two of the supplemental excerpts of record, submitted our own version of the jury instruction and requested that that jury instruction with the complete recitation of New York law be reflected in the verdict. Right, but the specific point about whether or not performance should be defined in the instruction on waiver, my specific question was, did you object to the court's declination to define performance? I want to say we did, Your Honor, but I'm sorry, I don't have a specific citation for you. All right, thank you. I have nothing else. Are there any other questions? I guess, do you want to respond to your opposing counsel's argument on the choice of law issue? And if I understand it right, his argument is that place of performance for Atencio and Caterin is determinative. I know your argument is that it doesn't matter to get to the choice of law, but do you want to address that? Are you speaking to me, Your Honor? The place of performance as to Caterin was in New York. Atencio, I think we're putting the heart, the cart before the horse if we talk about the place of performance. I mean, there is no evidence where he performed those services. He lived in California, but his primary contribution, if you will, was a press release that was distributed from the New York headquarters. And there were other comments that he made or he allied. He hasn't performed any work per se, except, as he says, to ally his name with TUNCOR. And TUNCOR at the time was in New York, the headquarters in New York. So, I mean, place of performance for Mr. Atencio is a bit vague, considering the vagueness of his contributions. All right. Thank you, counsel. If there is nothing else, we'll have rebuttal. Thank you, Your Honor. I'm going to be quick here. First, on the issue of fundamental policy of a state, I wanted to come back to this again, Judge Hunsaker and Judge England in particular. On this issue, you heard counsel state that New York's law specifically carves out incentive-based compensation, what they call incentive comp, from their statute. California and Schachter and Judge Hunsaker, to address your point, what I addressed earlier is that Bajoruk and Schachter seemed to come out the result the same because both individuals didn't meet the condition precedent. However, there is, I believe, a change in law in Schachter unequivocally because Schachter unequivocally says all incentive compensation is wages. And, you know, when you talk about the fundamental policy, I think that's why you saw the California legislature also specifically address this statute. That indicates to me the fundamental policy. So there's an or in the statute in terms of what I have to meet to get to that next step. Number two is, in terms of the relationship, Judge, you'll see that these are 10-year options, but due to participation, these gentlemen were going to work their day-to-day 10 years. The parties defined their terms. What happened is they took Mr. Price's deposition and thought he was going to give him favorable testimony, but he didn't. He said these gentlemen met all the conditions they were required to do. They associated their name. They referred artists. They did all sorts of things to make us successful. In terms of the question about performance, I don't believe they actually objected on the word performance. They objected to something about walling language. I don't believe there actually was, to answer Judge Robinson's question, ever an issue of the issue of performance. With regard to the supplemental record that I provided about the arbitrator's decision, the court, I've done research. This is interesting because one of the leading cases on judicial notice is Roe versus Wade. But this decision that the arbitrator rendered is now into subsequent litigation between the parties, and Judge Gee relied upon it. So I could give you, if necessary, a citation to actual federal court docket where Judge Gee is relying upon this, and you could take judicial notice of her relying upon the opinion itself. But it's clear that once I was permitted to prove the very evidence, qualify Mr. Cavern, present the evidence that, aha, the shares were worth more at the day of sale than they said, it wasn't $1.27. I proved $7.23. That wasn't the number I tried to prove, but that's what I did prove. So on that point, I get judicially stopped with, frankly, a gain. I mean, is this the way we practice law? They didn't file a summary judgment. They filed a motion to eliminate because they knew my clients were alleging that they were hiding documents and that the company was worth more money, and they were going to tell the jury that. So they filed a motion to eliminate, and Judge Gee abused their discretion by saying this is a judicial admission. When you read the language of the complaint, it's clear I was contesting it. So on that issue, if you remand, like I said, I think it's either summary judgment is a matter of law on that number, or the clerk enters it based upon a new calculation instead of the $1.27, the $7.23. And then finally, in the option agreements themselves, they state specifically they were being provided services rendered. This whole story about investment and waiver, and I just want to hit waiver for one minute. It's fundamentally based upon falsified testimony that was presented to the trial court. Mr. Caterin's options were canceled out of the cap tables without anybody's consent. They didn't expire. The testimony was altered at trial to create a waiver of defense that the jury and the judge both rejected. Thank you for your time. Both counsel, the case just argued is submitted for decision by the court that completes our calendar for the morning. We will be in recess until 930 a.m. tomorrow morning.
judges: Rawlinson, England, Hunsaker